UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NATIONAL HOSPICE AND PALLIATIVE
CARE ORGANIZATION, INC.,

    Plaintiff,

     v.

KERRY N. WEEMS, in his official capacity
as ACTING ADMINISTRATOR,
CENTERS FOR MEDICARE &
MEDICAID SERVICES,

and

MICHAEL O. LEAVITT, in his official
capacity as SECRETARY, DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

    Defendants.

Civil Action No. 08-1543 (CKK)

**MEMORANDUM OPINION**
(November 24, 2008)

    Plaintiff National Hospice and Palliative Care Organization, Inc., ("National Hospice")

bring this suit for declaratory and injunctive relief against Kerry N. Weems, in his official

capacity as Acting Administrator of the Centers for Medicare and Medicaid Services, and

Michael O. Leavitt, in his official capacity as Secretary of the United States Department of

Health and Human Services, (collectively "CMS").[1]  National Hospice seeks judicial review of a

final rule recently promulgated by CMS that, in relevant part, eliminates the budget neutrality

---

[1]The Centers for Medicare and Medicaid Services is the agency within the Department of
Health and Human Services ("HHS") that administers the Medicare program.  Prior to June
2001, it was known as the Health Care Financing Administration ("HCFA").  For convenience,
the Court shall use the term CMS to refer to the entity under either name.

adjustment factor ("BNAF"), an adjustment to the hospice wage index that is applied to Medicare payments for hospice services.

National Hospice filed the present complaint on September 5, 2008, along with a Motion for a Preliminary Injunction seeking to enjoin CMS from implementing the relevant portion of a final rule phasing out the BNAF effective October 1, 2008 ("2008 Final Rule"). The parties and the Court thereafter agreed to convert National Hospice's Motion for a Preliminary Injunction into a decision on the merits through cross-motions, and CMS agreed that, in the event National Hospice ultimately prevails in this case, CMS would retroactively reimburse hospices in accordance with the Court's final ruling for any amounts that would have been paid had the BNAF not been phased out beginning October 1, 2008.

Currently pending before the Court are National Hospice's Motion [2] for Preliminary Injunction ("Pl.'s Mot"), which the Court is treating as a Motion for Summary Judgment pursuant to the parties' agreement, and CMS' Motion [13] to Dismiss, or in the Alternative, for Summary Judgment ("Defs.' Mot."). After a thorough review of the parties' submissions, the administrative record, applicable case law, statutory authority and regulations, the Court concludes that it lacks subject matter jurisdiction over National Hospice's claims. Accordingly, because the Court resolves this matter solely on the legal grounds that it lacks subject matter jurisdiction and does not reach the merits of this case, the Court shall treat Defendants' Motion as a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and shall grant Defendants' Motion to Dismiss. Furthermore, as the Court is without jurisdiction to consider the merits of this case, the Court shall deny without prejudice Plaintiff's Motion for Summary Judgment, for the reasons set forth below.

# I. BACKGROUND

The Court shall first describe the Medicare statutes, regulations, and procedures providing the necessary context for the legal and procedural backgrounds that follow.

## A. *Medicare Statutes, Regulations, and Procedures*

### 1. Reimbursement for Hospices

Established in 1965 under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, Medicare is a federally funded health insurance program for the elderly and disabled. Subject to a few exceptions, Congress authorized the Secretary of Health and Human Services ("Secretary") to issue regulations defining reimbursable costs and otherwise giving content to the broad outlines of the Medicare statute. *See* 42 U.S.C. § 1395x(v)(1)(A). Section 122 of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248), enacted in 1982, expanded the scope of Medicare benefits by authorizing coverage for hospice care for terminally ill beneficiaries. *See* Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, § 122, 96 Stat. 356, 364. The hospice benefit was designed to provide patients who are terminally ill with comfort and pain relief, as well as emotional and spiritual support, generally in a home setting. *See* Final Rule Providing Medicare Hospice Coverage, 48 Fed. Reg. 56,008, 56,008 (Dec. 16, 1983). Medicare hospice services include nursing care, physical or occupational therapy, speech-language pathology services, medical social services, counseling, home health aide services, physicians' services, and short-term inpatient care, as well as drugs and medical supplies. 42 U.S.C. § 1395x(dd)(1). To be eligible for hospice benefits, an individual must be certified as "terminally ill," which is statutorily-defined as having a "medical prognosis that the individual's life expectancy is 6 months or less." *Id.* at §§1395f(a)(7)(A), 1395x(dd)(3)(A).

Hospice providers are reimbursed pursuant to section 1814(i) of the Social Security Act. *Id.* at § 1395f(i). The statute provides generally that hospice providers be paid "an amount equal to the costs which are reasonable and related to the cost of providing hospice care or which are based on such other tests of reasonableness as the Secretary may prescribe in regulations . . . ." *Id.* at § 1395f(i)(1)(A). The Secretary has, pursuant to this statutory authority, promulgated hospice-specific regulations directing the payment for hospice care under the Medicare Act. *See* 42 C.F.R. § 418, Subpart G (§§ 418.301 *et seq.*) ("Payment for Hospice Care").

As specified in CMS' regulations, hospices are reimbursed, via an intermediary,[2] for "each day during which the beneficiary is eligible and under the care of the hospice, regardless of the amount of services furnished on any given day." 42 C.F.R. § 418.302(e)(1). Payments vary depending on the type of care provided on the particular day. *See id.* at § 418.302(e)(2). There are four levels of care a hospice patient may receive: routine home care, continuous home care, inpatient respite care and general inpatient care. *Id.* at § 418.302(b). Each category of hospice care has its own daily payment rate, which is established by CMS in accordance with the methodology prescribed by Congress, codified at 42 U.S.C. § 1395f(i)(C). *Id.* at §§ 418.306(a), (b). Each fiscal year, CMS determines the new payment rates for the four categories of hospice care by adjusting the prior fiscal year's payment rates by a market based percentage increase ("MBPI"). *See* 42 U.S.C. § 1395f(i)(1)(C)(ii); 42 C.F.R. § 418.306(b)(2).[3] The result of these

---

[2] "Fiscal intermediaries" are public or private entities (usually insurance companies under contract with CMS) that make initial determinations as to the appropriate reimbursement amounts, process payments, and conduct year-end reconciliation. *See* 42 U.S.C. §§ 1395h, 1395kk-1; *see also* Def.'s Mot. at 4 n.1.

[3] The market based percentage increase is intended to adjust the annual payment rates for inflation and refers to the rate of increase in the hospital market basket index used to adjust

calculations is the nationwide payment rates for the four categories of hospice care, which the Court shall refer to, for purposes of this opinion, as the "statutory payment rates."

The statutory payment rates are then adjusted to reflect geographic differences in labor costs throughout the country. *See* 42 C.F.R. §§ 418.302(g), 418.306(c). This is accomplished through application of the hospice wage index. *See* 42 C.F.R. § 418.306(c). As set out in CMS regulations, the local intermediaries apply the relevant hospice wage index value to the statutory payment rates to determine the specific payment rates applicable to a particular hospice. 42 C.F.R. § 418.306(c); 73 Fed. Reg. at 24,001. That is, the hospice wage index is intended to "permit payment of higher rates in areas with relatively high wage levels, and proportionately lower rates in areas with wage levels below the national average." Final Rule Establishing 1997 Revised Hospice Wage Index, 62 Fed. Reg. 42,860, 42,860 (Aug. 8, 1997). In order to implement the adjustments for wage variations, the statutory payment rates for each of the four categories of hospice care are broken down into a labor and non-labor component. *Id.* at 42,861. CMS then multiplies the labor component by the hospice wage index value attributable to the area in which the hospice is located, to determine the adjusted labor component. *Id.* Once the adjusted labor component is calculated, it is added to the non-labor component of the applicable hospice payment rate (which does not vary based on geography) to determine a particular hospice's adjusted payment rates. *Id.* The Court shall refer to these payment rates, which have been adjusted to account for local wage differences, as the "adjusted payment rates."

---

payments for inpatient hospital services under the Medicare prospective payment system. 42 U.S.C. § 1395ww(b)(3)(B)(iii); *see also id.* at § 1395f(i)(1)(C)(ii)(VII) (requiring application of the market based percentage increase to hospice payment rates).

2.   The Hospice Wage Index

CMS has required application of a hospice wage index to the labor component of the statutory payment rates in this way since the index was first established in 1983.  The methodology for calculating the hospice wage index, however, has changed over time.  That is, although a hospice wage index has existed in one form or another since 1983, the hospice wage index itself has varied.  The instant lawsuit focuses on one aspect of that changing methodology—the BNAF.

a.  The Initial Hospice Wage Index (1983-1997)

The initial hospice wage index, as adopted in 1983, was based on the wage index established that same year for the determination of Medicare inpatient hospital prospective payment rates, which was in turn based on 1981 Bureau of Labor Services ("BLS") hospital data.  *See* Proposed Rule Regarding 1997 Revised Hospice Wage Index, 61 Fed. Reg. 46,579, 46,580 (Sept. 4, 1996).  The hospice wage index was not amended for several years, and therefore continued to be calculated based on the 1981 BLS data.  *Id.*  CMS commenced a negotiated rulemaking process in October of 1994 to consider and select a new methodology for calculating the hospice wage index.  *Id.*  As part of the rulemaking process, CMS established the Negotiated Rulemaking Advisory Committee on the Medicare Hospice Wage Index ("Committee").  *Id.* The Committee met five times between November 1994 and April 1995, before eventually reaching consensus on a new methodology for determining the hospice wage index, as set forth in the Committee Statement.  *Id.*  The Committee made several recommendations, which, after notice and comment rulemaking, were in large part adopted by CMS as part of a final rule published on August 8, 1997 ("1997 Final Rule").  *See* 62 Fed. Reg. at 42,681.

6

### b.   The Revised Hospice Wage Index (1997-2008)

In the 1997 Final Rule, CMS announced, consistent with the Committee's recommendations, that the hospice wage index would no longer be determined based on the 1981 BLS data.  *Id.* at 42,862.  Rather, the hospice wage index, going forward, would be based on a version of the current hospital wage index,[4] subject to certain adjustments—including, as is relevant here, the BNAF.  *See id.*  The 1997 Final Rule provided that the revised hospice wage index would be implemented over a three-year transition period, at the conclusion of which the revised hospice wage index would be fully implemented.  *Id.*  The revised hospice wage index would be updated yearly thereafter.  *Id.*

The budget neutrality adjustment factor, or BNAF, was recommended by the Committee and adopted by CMS as part of the 1997 Final Rule.  *Id.*  As described by the Committee, the BNAF was intended to ensure that

> [E]ach year in updating the wage index, aggregate Medicare payments to hospices would remain the same, using the revised wage index as if the 1983 wage index had not been updated.  Thus, although payments to individual hospice programs may change each year, overall Medicare payments to hospices would not be affected by updating the wage index, that is, budget neutrality will be maintained during and after the transition period.

Proposed Rule for Revised 1997 Revised Hospice Wage Index, 61 Fed. Reg. 46,579, 46,581 (Sept. 4, 1996).  The BNAF was calculated annually, according to the following methodology.

---

[4]The hospital wage index is calculated by examining average wages of hospitals in a given geographic area relative to the national average.  *See* 42 U.S.C. § 1395ww(d)(3)(E); 42 C.F.R. § 412.64(h).  Under 42 U.S.C. § 1395ww(d)(10), a hospital may apply to be "reclassified" from one geographic area to another for purposes of the hospital wage index, which may affect the wage index values for the relevant geographical areas.  *See, e.g., id.* § 1395ww(d)(8)(C).  The hospice wage index, however, does not take into account any hospital reclassifications under 42 U.S.C. § 1395ww(d)(10), but instead is based on the "pre-classified" hospital wage index.  *See* 1997 Final Rule, 62 Fed. Reg. 42860, 42862.

62 Fed. Reg. at 42,862.  First, CMS established the payments that would have been made under the initial hospice wage index, by calculating the labor-related payments for each of the four categories of hospice care using patient bills for the most recent complete fiscal year.  *Id.*  The resulting dollar amount was the target for the budget neutrality calculation.  *Id.*  Second, CMS would calculate payment rates separately for the labor-related payments using the hospice wage index set forth in the 1997 proposed rule (*i.e.,* pre-adjustments).  *Id.*  The BNAF was calculated as the multiplier by which the labor-related payments using the 1997 proposed hospice wage index must be adjusted to equal the labor-related payments using the initial 1983 hospice wage index, taking into account the adjustments to hospice wage index values below, at or above 0.8 (as discussed above).  *Id.*  Finally, that resulting number—the BNAF—was applied, in certain circumstances, to adjust a hospice's wage index value based on the geographic location of the services provided.  *Id.*  Specifically, all hospice wage index values of 0.8 or greater were adjusted by applying the BNAF, while all hospice wage index values of below 0.8 received the greater of either: (i) a fifteen percent increase, subject to a maximum wage index value of 0.8; or (ii) a BNAF adjustment.  *Id.*

### c. The Current Hospice Wage Index (Effective October 1, 2008)

On May 1, 2008, CMS published a proposed rule in the Federal Register that proposed, in relevant part, to phase out the BNAF over a three-year period, beginning on October 1, 2008.  *See* Proposed Rule for 2008 Hospice Wage Index, 73 Fed. Reg. 24,000, 24,004-05 (May 1, 2008).  Specifically, CMS proposed to reduce the BNAF by 25 percent in FY 2009, by an additional 50 percent (for a total of 75 percent) in FY 2010, and eliminating it completely in FY 2011.  *Id.*  CMS received 540 items of correspondence in response to its proposed rule.  Final

Rule for 2008 Hospice Wage Index, 73 Fed. Reg. 46,464, 46,465 (Aug. 8, 2008).  CMS

subsequently published a final rule on August 8, 2008 ("2008 Final Rule"), which adopted CMS'

proposal to phase out the BNAF.  *Id.* at 46,464.

2.  Administrative and Judicial Review Provisions under Medicare

*a.  General Administrative Review Provisions under Part A of  Medicare*

The general procedures for provider reimbursement determinations and appeals for Part

A Medicare providers are set forth at 42 U.S.C. § 1395oo and 42 C.F.R. Part 405, Subpart R (§§

405.1801 *et seq.*).[5]  Under these provisions, providers of Medicare Part A services must file an

annual cost report with the fiscal intermediary in order to receive Medicare reimbursement.  *See*

42 C.F.R. §§ 413.20, 413.24.  On the basis of the cost report, the intermediary makes a

"determination," also known as a "notice of amount of program reimbursement" ("NPR"), of the

total amount the provider should be paid for the services rendered to Medicare beneficiaries

during the reporting period.  *Id.* at § 405.1803.  If a provider is dissatisfied with its payment

determination, the provider may seek administrative appeal in either one of two ways.  First, if

the amount in controversy is at least $1,000 but less than $10,000, the provider may demand a

hearing before the intermediary itself, *id.* at § 405.1809, within 180 days of the determination, *id.*

at § 405.1811(a).  Or, alternatively, if the amount in controversy is $10,000 or more, the provider

may demand a hearing before the PRRB, within 180 days after receipt by the provider of the

---

[5]Neither party disputes that 42 U.S.C. § 1395oo and 42 C.F.R. Part 405, Subpart R (§§ 405.1801 *et seq.*) set forth the administrative review procedures generally applicable to Part A providers, nor does either party dispute the substance of those procedures.  The parties do, however, disagree as to whether and to what extent those provisions apply to *hospices*.  As is discussed in greater detail below, this dispute is not material to the Court's decision and the Court therefore need not resolve this issue.  *See infra* 17-19.

intermediary's determination.  42 U.S.C. § 1395oo(a); 42 C.F.R.§ 405.1835.  After its hearing, the Board renders a decision, 42 C.F.R. § 405.1871(a), which the Secretary (acting through the CMS Administrator) may then, in his discretion, review.  *Id.* at § 405.1875.  After a final decision is reached, the provider has 60 days to seek judicial review in district court.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.

If the Board determines, however, that it lacks authority to decide a question of law presented by an administrative appeal, the Medicare statute provides for expedited judicial review ("EJR") in lieu of an administrative hearing.  *See* 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.  That is, a provider has "the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received."  42 U.S.C. § 1395oo(f)(1); *see also* 42 C.F.R. § 405.1842.  If a provider believes that EJR is warranted, the provider files "a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy."  42 U.S.C. § 1395oo(f)(1); *see also* 42 C.F.R. § 405.1842(b)(2).  The Board must render such determination with 30 days.  42 U.S.C. § 1395oo(f)(1); *see also* 42 C.F.R. § 405.1842(b)(2).

### b. Hospice-Specific Administrative Appeals Provisions

CMS has also promulgated a regulation specifically addressing administrative appeals by hospices.  *See* 42 C.F.R.§ 418.311.  That regulation provides as follows:

10

>A hospice that believes its payments have not been properly determined in accordance with these regulations may request a review from the intermediary or the Provider Reimbursement Review Board (PRRB) if the amount in controversy is at least $1,000 or $10,000, respectively. In such a case, the procedure in 42 CFR Part 405, Subpart R, will be followed to the extent that it is applicable. The PRRB, subject to review by the Secretary under § 405.1874 of this chapter, shall have the authority to determine the issues raised. The methods and standards for the calculation of the payment rates by [CMS] are not subject to appeal.

*Id.* This regulation is at the heart of the present litigation.

### B.  Procedural Background

National Hospice filed a complaint in the instant action on September 5, 2008, along with a Motion for a Preliminary Injunction ("Pl.'s Mot."). *See* Docket Nos. [1] & [2]. In its complaint, National Hospice alleges: (1) that CMS' decision to eliminate the BNAF is contrary to the Medicare statute, and is therefore in violation of the Administrative Procedures Act ("APA") which prohibits CMS from implementing the Medicare program in a manner contrary to law, Compl. ¶¶ 62-68; (2) that CMS' decision to eliminate the BNAF is arbitrary, capricious and an abuse of discretion in violation of the APA, *id.* ¶¶ 69-74; (3) that CMS did not adequately address concerns raised in comments to the proposed rule or provide an adequate statement of basis and purpose, in violation of the APA, *id.* ¶¶ 75-79; and finally (4) that CMS failed to prepare an initial and final regulatory flexibility analysis as required under the Regulatory Flexibility Act, *id.* ¶¶ 80-88.

After discussions between the parties and with the Court, the Court issued a Consent Order on September 15, 2008, whereby the parties agreed to convert National Hospice's Motion into a decision on the merits through cross-motions, and CMS agreed that, in the event National Hospice ultimately prevailed in this case, CMS would retroactively reimburse hospices in accordance with the Court's final ruling for any amounts that would have been paid had the

BNAF not been phased out beginning October 1, 2008.  Consent Order, 9/15/08, Docket No. [8].

Pursuant to the briefing schedule adopted by the Court, CMS filed its Motion to Dismiss, or in

the Alternative, for Summary Judgment ("Defs.' Mot."), which also served as Defendants'

Opposition to Plaintiff's converted Motion for Summary Judgment, as well as Defendants'

Statement of Facts.  Docket No. [13].  CMS also filed the Administrative Record.  Docket No.

[11].  National Hospice subsequently filed its Opposition to CMS' Motion ("Pl.'s Opp'n"),

which also serves as its Reply in Support of its own Motion, and its Statement of Facts, Docket

No. [17], and CMS filed its Reply in Support of its Motion ("Def.'s Reply"), Docket No. [18].

 Although not contemplated by the September 15, 2008 Consent Order, National Hospice

filed a Sur-Reply to CMS' Motion to Dismiss ("Pl.'s Sur-Reply"), Docket No. [25], and CMS

filed a Response to National Hospice's Sur-Reply ("Defs.' Resp. to Pl.'s Sur-Reply"), *see*

Docket No. [24].[6]  In addition, the American Academy of Hospice and Palliative Medicine filed

a Brief as *Amicus Curiae* in Support of National Hospice's Motion, Docket No. [16], to which

CMS filed a Response, Docket No. [19].  At the Court's request, the parties also filed additional

limited briefing in response to two specific questions set forth by the Court in an October 28,

2008 Minute Order.  *See* Pl.'s Supp. Mem., Docket No. [29]; Defs.' Supp. Mem., Docket No.

[30]; Pl.'s Supp. Resp., Docket No. [31]; Defs.' Supp. Resp., Docket No. [32].  Accordingly, the

parties' Motions have been fully briefed and are ripe for decision.

---

[6]Because the Court finds that Defendants' Response to Plaintiff's Sur-Reply is useful to the Court in ruling on the threshold question of subject matter jurisdiction, the Court shall grant Defendants' Motion for Leave to File Response to Plaintiff's Sur-Reply, Docket No. [24].  The Court notes that it has reviewed all parties' briefing on this issue, including Plaintiff's Opposition, Docket No. [26], and is aware of and considers the arguments contained therein.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); *see also Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998). A court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the alleged facts. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *Koutny v. Martin*, 530 F. Supp. 2d 84 (D.D.C. 2007) ("[A] court accepts as true all of the factual allegations contained in the complaint and may also consider 'undisputed facts evidenced in the record'") (internal citations omitted). However, "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge*, 185 F. Supp. 2d at 13-14 (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350).

## III. DISCUSSION

The parties vigorously dispute whether National Hospice has set forth a proper basis for the Court's jurisdiction. National Hospice, in its complaint, invokes as the sole basis for this Court's jurisdiction federal question jurisdiction under 28 U.S.C. § 1331, which states that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." Compl. at ¶ 13. CMS responds by arguing that, because

National Hospice's claims arise under the Medicare Act, its member hospices must first exhaust their administrative remedies under that statute before seeking judicial review.[7] *See generally* Def.'s Mot. at 15-21.

It is axiomatic that "[a] federal court's subject matter jurisdiction, constitutionally limited by article III, extends only so far as Congress provides by statute." *Commodity Futures Trading Comm'n v. Nahas*, 738 F.2d 487, 492 (D.C. Cir. 1984). The court must therefore "scrupulously observe the precise jurisdictional limits prescribed by Congress." *Id.* at 492 n.9. Section 405(h) of the Social Security Act, made applicable to the Medicare Act by 42 U.S.C. § 1395ii, strips courts of general federal question jurisdiction for claims "arising under" the Medicare Act:

> No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 of title 28 to recover on any claim arising under this subchapter [*i.e.*, the Medicare Act].

42 U.S.C. § 405(h). "This bar against § 1331 actions applies to all claims that have their 'standing and substantive basis' in the Medicare Act." *Am. Chiropractic Ass'n, Inc. v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005) (quoting *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 11 (2000)). "Thus, general federal question jurisdiction is generally unavailable for 'any claim arising under' the Medicare Act—i.e., any claim that has its 'standing and . . . substantive basis' in that Act." *Action Alliance of Senior Citizens v. Leavitt*, 483 F.3d 852, 858-59 (D.C. Cir. 2007) (quoting *Illinois Council*, 529 U.S. at 11)).

---

[7]National Hospice is a non-profit membership organization representing over 2300 hospices in the United States. Pl.'s Mot. at 4. National Hospice therefore "speaks only on behalf of its member institutions, and thus has standing only because of the injury those members allegedly suffer." *Shalala v. Illinois Council on Long Term Care, Inc.,* 529 U.S. 1, 24 (2000).

14

The Supreme Court has explained that, "insofar as [§ 405(h)] demands the 'channeling' of virtually all legal attacks through the agency, it assures the agency greater opportunity to apply, interpret, or revise policies, regulations, or statutes without possibly premature interference by different individual courts." *Illinois Council*, 529 U.S. at 13.  Although this channeling requirement may cause delay-related hardship, Congress has judged that "a universal obligation to present a legal claim first to [CMS], though postponing review in some cases, would produce speedier, as well as better, review overall." *Id.* at 19.  This is particularly true in the context of Medicare—"a massive, complex health and safety program . . ., embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations, any of which may become the subject of a legal challenge in any several different courts." *Id.* Moreover, the Supreme Court has emphasized that the channeling requirement applies even if "the agency might not provide a hearing for [the plaintiff's] *particular contention*, or may lack the power to provide one." *Id.* at 23 (emphasis in original).  The Supreme Court has therefore made clear that the process for administrative appeal under Medicare must be followed, where available, even if it is time-consuming and even if the agency cannot grant the relief sought. *Three Lower Counties Comm'ty Health Servs., Inc. v. United States Dep't of Health and Human Servs.*, 517 F. Supp. 2d 431, 435 (D.D.C. 2007) (citing *Illinois Council*, 529 U.S. at 22-24).

There is, however, "an exception to this rule where application of §§ 1395ii and 405(h) 'would not lead to a channeling of review through the agency, but would mean no review at all.'" *Action Alliance*, 483 F.3d at 859 (quoting *Illinois Council*, 529 U.S. at 17).  In other words, "if the claimant can obtain judicial review only in a federal question suit, § 1395ii will not bar the suit." *Am. Chiropractic,* 431 F.3d at 816.  "The exception applies not only when

administrative regulations foreclose judicial review, but also when roadblocks practically cut off any avenue to federal court." *Id.* It is not enough, however, "that claimants would encounter 'potentially isolated instances of the inconveniences sometimes associated with the postponement of judicial review,' or that their claims might not receive adequate administrative attention." *Id.* (quoting *Illinois Council*, 529 U.S. at 10-13). Rather, the claimants must show that, absent judicial review pursuant to § 1331, their claims would never be subject to judicial review at all. *See id.*

National Hospice does not argue that its claims do not arise under the Medicare Act. Nor could it have done so, as it is clear that National Hospice's claims in this case have both their "'standing and substantive basis' in the Medicare Act." *Am. Chiropractic,* 431 F.3d at 816 (quoting *Illinois Council*, 529 U.S. at 11). Although National Hospice frames its claims as challenges to CMS' decision eliminating the BNAF, the Supreme Court has made clear that such claims are, at bottom, claims for payment of benefits under Medicare. *See Heckler v. Ringer*, 466 U.S. 602, 614 (1984) (plaintiffs' procedural claims challenging Secretary's compliance with APA are "inextricably intertwined" with claims for benefits, and it therefore "makes no sense to construe the claims . . . as anything more than, at bottom, a claim that they should be paid [for services]"). Accordingly, it is evident that National Hospice's claims arise under the Medicare Act.

National Hospice instead denies that its claims could even become the subject of an administrative proceeding, arguing that CMS regulations expressly bar administrative review of the claims asserted in the instant lawsuit. CMS argues the opposite. "The question therefore is whether [National Hospice] could get its claims heard administratively and whether it could

16

receive judicial review after administrative channeling." *Am. Chiropractic*, 431 F.3d at 816.

A. *Applicable Administrative and Judicial Review Procedures under Medicare*

At the outset, the Court notes that the parties dispute which administrative and judicial review regulations apply to National Hospice's claims.  As detailed above, 42 U.S.C. § 1395oo and 42 C.F.R. Part 405, Subpart R (§§ 405.1801 *et seq.*) set forth the general procedures for provider reimbursement determinations and appeals for Part A Medicare providers, while 42 C.F.R. § 418.311 specifically addresses administrative appeals by hospices.  The parties disagree over whether and to what extent the former apply to hospices, in light of the latter hospice-specific regulation addressing administrative appeals.

National Hospice asserts that 42 U.S.C. § 1395oo and 42 C.F.R. Part 405, Subpart R do not apply directly to hospices, and that hospices are permitted to pursue administrative appeals only to the extent allowed by the hospice-specific regulation cited above.  Pl.'s Sur-Reply at 6-7. National Hospice contends that such an interpretation is compelled not only by the explicit text of section 418.311, but also by practical differences between hospices and other Part A providers.  *Id.*  According to National Hospice, hospices—unlike most Part A providers that are paid on a reasonable cost basis, file a cost report for reimbursement purposes, and receive a NPR—are not paid on a reasonable cost basis, file a cost report for informational purposes only, and do not receive a NPR.  Pl.'s Opp'n at 4–6.  Because the general administrative procedures set forth under  42 U.S.C. § 1395oo and 42 C.F.R. Part 405, Subpart R are triggered only by the receipt of a NPR, which hospices do not receive, National Hospice contends that the general administrative procedures are not directly applicable to hospices.  *Id.*  Moreover, National Hospice asserts that CMS promulgated the hospice-specific regulation recognizing that the

17

general administrative appeals procedures do not apply to hospices.  Pl.'s Opp'n. at 5 (citing 48

Fed. Reg. at 38,159 ("Since the normal administrative appeals process under section 1878 of the

Act applies only to issues related to cost reimbursement, we are creating an appeals procedure

that is comparable to the statutory procedures but that is not based on section 1878 (*i.e.,* 42

U.S.C. § 1395oo).")).

In contrast, CMS contends that the general appeal procedures set forth in 42 C.F.R. Part

405, Subpart R apply to hospices equally and in the same manner as they apply to other Part A

providers, such as hospitals.  Def.'s Reply at 3-6.  According to CMS, hospices are required to

file cost reports in order to be reimbursed for Medicare services, such that the general

administrative procedures are triggered.  *Id.* at 4-5.  CMS further contends that a new regulation,

effective August 21, 2008, makes clear that hospices are subject to 42 C.F.R. Part 405, Subpart

R.  *Id.* (citing 42 C.F.R. § 405.1801(b)(1) ("In order to be paid for services furnished to

Medicare beneficiaries, a provider must file a cost report basis with its intermediary as specified

in § 413.24(f) of this chapter.  For purposes of this subpart, the term 'provider' includes a . . .

hospice program. . . .")).

Ultimately, the Court concludes that it need not resolve this dispute.  Even National

Hospice concedes that its member hospices have the right to administrative appeal to the extent

permitted by 42 C.F.R. 418.311.  Pl.'s Sur-Reply at 6-7 ("plaintiff pointed out that those rules

[42 U.S.C. § 1395oo and 42 C.F.R. Part 405, Subpart R] permit hospices only those internal

administrative appeals allowed by the hospice regulation . . . 42 C.F.R. § 418.311).  Section

418.311, in turn, expressly provides that, in the event an administrative appeal is available, "the

procedure in 42 CFR Part 405, Subpart R, will be followed to the extent that it is applicable."

Accordingly, as a practical matter, if section 418.311 does not preclude administrative appeal of

National Hospice's claims, then its member hospices must first pursue their claims through the

available administrative procedures—*i.e.*, the procedures generally set forth in 42 C.F.R. Part.

405, Subpart R.  That is, under either National Hospice's or CMS' interpretation of the relevant

regulations, National Hospice's claims are subject to administrative review by CMS if the Court

finds that the section 418.311 does not preclude administrative appeal.  Thus, as framed by the

parties, whether National Hospice's claims are subject to administrative appeal is dependent—in

the first instance—on the interpretation of 42 C.F.R. § 418.311, the regulation addressing

administrative appeals for hospices under the Medicare Act.  Because the Court finds, for the

reasons discussed  below, that section 418.311 does not preclude administrative appeal of

National Hospice's claims, the Court need not reach the issue of whether those administrative

procedures apply directly through 42 CFR Part 405, Subpart R or indirectly through 42 C.F.R. §

418.311.

   *B.  Interpretation of 42 C.F.R. § 418.311*

   Determining whether National Hospice's claims are precluded from administrative

appeal therefore depends upon interpretation of CMS' own regulation—42 C.F.R. § 418.311.

The initial sentence of that section permits a hospice to seek administrative appeal of a payment

determination.  42 C.F.R. § 418.311.  The last sentence of the section, however, appears to

preclude that right of appeal in certain circumstances.  *Id.*  It reads: "The methods and standards

for the calculation of the payment rates by CMS are not subject to appeal."  *Id.*  Whether that last

sentence precludes administrative appeal in this particular circumstance is the subject of the

parties' dispute.

CMS contends that the last sentence of 42 C.F.R. § 418.311 "does not exempt hospices from the requirement that they exhaust administrative remedies prior to seeking judicial review." Def.'s Reply at 6.  Specifically, CMS asserts that the term "payment rates," as it is used in section 418.311, refers only to "the statutory payment rates that apply to each of the four types of services that hospices provide"—*i.e.,* the statutory payment rates determined in accordance with the methodology set by Congress.  *Id.*  Accordingly, under this interpretation, the BNAF is not a part of the methodology for determining the statutory payment rates.  Rather, it is an "adjustment" to the hospice wage index, which is itself an "adjustment" applied to the statutory payment rates (to determine the adjusted payment rates).  *Id.*  Accordingly, pursuant to CMS' interpretation of section 418.311, nothing in the regulation precludes "administrative appeals of payment determinations that are based on CMS' calculation and application of the wage index, including any adjustment to a hospice's payments as a result of phasing out the BNAF."  *Id.* at 8. National Hospice, by contrast, disputes CMS' interpretation of "payment rates" and argues that the BNAF and hospice wage index adjustments are encompassed within that term, as it is used in 42 C.F.R. § 418.311.  Pl.'s Sur-Reply at 3-6.  That is, National Hospice contends that the term "payment rates" references the adjusted payment rates, not just the statutory payment rates, such that the methodology for determining the "payment rates" includes the BNAF.

As the Court construes the parties' arguments, the question of whether 42 C.F.R. § 418.311 precludes National Hospice's claims thus turns on the meaning of the term "payment rates," as used in that section.  As discussed above, *supra 4-5*, there are two basic steps in determining the payment rates applicable to a particular hospice.  First, CMS calculates the statutory payment rates for the four categories of hospice care, which apply nationwide.  Second,

the intermediaries take the statutory payment rates, apply the relevant hospice wage index values, and calculate the adjusted payment rates applicable to a particular hospice. *See supra* 4-5. Accordingly, there are two "types" of payment rates—the statutory payment rates involved in the first step and the adjusted payment rates in the second step.  As the issue is presented by the parties, if the term "payment rates" as used in section 418.311, refers to the former, the section does not preclude administrative appeal of claims relating to the BNAF.

In resolving this question, the Court is mindful that it "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  Indeed, "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16 (1965).  Accordingly, as the Supreme Court has stated, a court's "task is not to decide which among several competing interpretations best serves the regulatory purpose.  Rather the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Thomas Jefferson Univ.*, 512 U.S. at 512 (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414 (1945)).  Significantly, "[t]his broad deference is all the more warranted when, as here, the regulations concerns 'a complex and highly technical regulatory program,' in which the identification and classification of relevant 'criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns.'" *Id.* (considering CMS' interpretation of Medicare regulations) (quoting *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).

1. The Term "Payment Rates," as used in 42 C.F.R. § 418.311, is Ambiguous

Upon review of section 418.311, the Court finds that it is not clear from the regulation's

plain language whether the term "payment rates," as used in that section, refers to the statutory payment rates or the adjusted payment rates.  Section § 418.311 does not specifically define the term nor have the parties pointed the Court to any definition of that term in the hospice-specific regulations.  To the contrary, the term is used throughout 42 C.F.R. Part 418, Subpart G ("Payment for Hospice Care") to refer to both the statutory payment rates as well as the adjusted payment rates.  For example, both parties focus on the term's use in 42 C.F.R. § 418.306, which is entitled "determination of payment rates."  Paragraph (a) of that section provides that "CMS establishes payment rates for each of the categories of hospice care . . . using the methodology described in section 1814(i)(1)(C) of the Act."  Similarly, paragraph (b) of section 418.306 is entitled "payment rates" and details the statutory payment rates for the four categories of hospice care.  The hospice wage index is, by contrast, addressed in paragraph (c), which is entitled "adjustments for wage differences."  These portions of section 418.306 thus make the same distinction urged by CMS—*i.e.,* a distinction between statutory payment rates and adjustments to those rates—and use the term "payment rates" to refer only to those statutory payment rates established by CMS pursuant to the methodology set by Congress.

National Hospice, by contrast, emphasizes paragraph (d) of that section, which provides that CMS must "publish[] in the Federal Register any proposal to change the methodology for determining the payment rates."  Pl.'s Sur-Reply at 4-5.  As National Hospice argues, because CMS has conceded it has no authority to change the statutory payment rates, the only "change" to the "methodology for determining the payment rates" that CMS may implement is a change to the wage index or its components, including the BNAF.  *Id.*  The term "payment rates" in this paragraph therefore appears to reference the adjusted payment rates.  National Hospice also

argues that inclusion of paragraph (c), addressing the wage adjustments, in section 418.306, which is in entitled "determination of payment rates," demonstrates that the BNAF is one aspect of the payment rates. *Id.* at 4. But because the section proceeds to use the term "payment rates" to refer to both statutory and adjusted payment rates, the meaning of the term remains unclear. Admittedly, then, the meaning of the term "payment rates," as used in the hospice-specific regulations, is ambiguous. Given this ambiguity, the Court acknowledges that the term is subject to interpretation, and both CMS' and National Hospice's readings of that term are plausible. The Court's task, however, "is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ.*, 512 U.S. at 512.

### 2.  CMS' Interpretation of 42 C.F.R. § 418.311 is Reasonable

The Court finds that CMS' interpretation of section 418.311 is reasonable. In essence, CMS contends that the hospice-specific administrative appeals regulation should be read to make a distinction between statutory payment rates, which are determined in accordance with a statutorily-mandated methodology, and adjustments to those rates, which are determined in accordance with CMS regulations. The agency does not have discretion to change the statutory payment rates, but simply calculates the new rates each year using the methodology mandated by Congress. *See* 42 U.S.C. § 1395f(i)(1)(c)(ii); 42 C.F.R. § 418.306. The updated statutory payment rates are "published through a separate administrative instruction issued annually in the summer to provide adequate time to implement system change requirements." 73 Fed. Reg. at 46,465. These statutory payment rates apply nationally, such that there is one nationwide

statutory payment rate for each of the four categories of hospice care.  *See* 42 C.F.R. § 306.  By

contrast, the BNAF and the hospice wage index are not statutorily-prescribed or mandated by

Congress.  Rather, Congress has given CMS the discretion to determine actual payments to

hospices based "on tests of reasonableness as the Secretary may prescribe in regulations."  *See*

42 U.S.C. § 1395f(i)(1)(A).  Although the payment rates are statutorily-prescribed by Congress,

the hospice wage index and the BNAF are promulgated by CMS pursuant to its regulatory

authority to prescribe "tests of reasonableness" to determine actual hospice payments.  *See id.*

CMS therefore has discretion to modify or change the methodology used to determine the

hospice wage index and the BNAF (subject to notice and comment rulemaking), but does not

have similar discretion to modify or change the methodology used to determine the statutory

payment rates.

CMS' interpretation of section 418.311 recognizes this difference and asserts that,

although the regulation may preclude administrative appeal of the methodology for determining

the statutory payment rates set by Congress—*i.e.,* issues that are determined by Congress and

that are beyond the agency's discretion to affect— it does not preclude administrative appeal of

the methodology for determining the hospice wage index and its components, including the

BNAF—*i.e.,* issues within the agency's discretion to modify or change, subject to notice and

comment rulemaking.  By precluding administrative appeal only of issues that CMS has no

authority to "revise," but permitting administrative appeals of issues that are within CMS'

discretion, this interpretation is consistent with the Congressional channeling requirement, which

is intended to "assure[] the agency greater opportunity to apply, interpret or revise" its own

regulations.  *Illinois Council*, 529 U.S. at 13, 20.  This is particularly true in the context of

Medicare, "a massive, complex health and safety program," *id.*, which "necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns," *Thomas Jefferson Univ.*, 512 U.S. at 512.  As the Supreme Court held in *Illinois Council*: "Proceeding through the agency in this way provides the agency with the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges."  529 U.S. at 24.  CMS' interpretation requiring National Hospice's member hospices to first present their claims—claims that are based on the agency's regulations—to the agency is entirely reasonable. The Court, cognizant of the deference owed to the agency's interpretation, therefore concludes that CMS' interpretation is controlling.

> 3.  <u>National Hospice has not shown that CMS' interpretation is "plainly erroneous"</u>

National Hospice urges the Court to reject CMS' interpretation in favor its own.  The Court notes, however, that in doing so, National Hospice fails to acknowledge the level of deference owed to an agency's own interpretation of its regulations.  The Court concludes nevertheless that National Hospice's arguments do not show that CMS' interpretation is plainly erroneous or otherwise not entitled to deference.

First, National Hospice contends that CMS' interpretation is inconsistent with the plain language of section 418.306 ("determination of payment rates"), which National Hospice alleges demonstrates that the term "payment rates" includes the hospice wage index and BNAF.  Pl.'s Sur-Reply at 3-6.  But, as already discussed, the Court finds that the term "payment rates" as used in section 418.306 is ambiguous.  *See supra* 21-23.  Given this ambiguity, the Court defers to the Secretary's reasonable interpretation.  *Thomas Jefferson Univ.*, 512 U.S. at 512.

Second, National Hospice argues that the Secretary's interpretation is inconsistent with

CMS' intention at the time the hospice administrative appeals regulation was promulgated.  Pl.'s

Sur-Reply at 5-6.   Specifically, National Hospice cites to the following language in 48 Fed. Reg.

at 38,159  (explaining the proposed 42 C.F.R. § 418.311):

> A hospice that believes an error has been made in the determination of the amount
> of  Medicare  payments  may  appeal  the  determination.  Since  the  normal
> administrative appeals process under section 1878 of the Act applies only to issues
> related  to  cost  reimbursement,  we  are  creating  an  appeals  procedure  that  is
> comparable to the statutory procedure but that is not based on section 1878. For
> example,  the  hospice  may  appeal  the  intermediary's  determination  as  to  which
> payment level is applicable for each day, or the intermediary's determination as to
> whether services provided outside the hospice program are related or unrelated to the
> terminal illness. The methods and standards for the calculation of the payment rates
> by [CMS] would not be subject to an administrative appeal.
>
> Hospice appeals of the computation of the payment limit or the amount due the
> hospice may be made when the amount in controversy is $1,000 or more. In this
> case, the hospice is entitled to a hearing by the intermediary. The hospice would
> present evidence to indicate that an error has been made in the calculations or that
> the intermediary did not apply the correct procedures in determining the amount of
> reimbursement. The hospice would also be permitted to appeal these issues to the
> Provider Reimbursement Review Board (PRRB) if the amount in controversy is
> $10,000 or more. The appeals process is set forth in 42 CFR Part 405, Subpart R.
> The intermediary or PRRB hearings are not appropriate for disputes involving the
> substance of the regulations or the law, such as the calculation of the payment
> amounts by [CMS].

*Id.*  National Hospice's argument is twofold: one, that the claims at issue in this case do not

relate to the examples of appealable determinations as listed above, such as the determination

whether a particular service is covered by Medicare; and two, that the final sentences of both

paragraphs make clear that National Hospice's challenges to "the substance of the regulations or

the law" and "the calculation of payment amounts" are not subject to appeal.   *Id.*

The Court does not agree that CMS' interpretation of section 418.311 is inconsistent with

this language.  As an initial matter, the list of examples provided in the two paragraphs above are

illustrative only, not exhaustive.  Moreover, as previously explained above, National Hospice

claims are, at bottom, claims for payment of benefits. *See supra* 16. The above language from the Federal Register recognizes that a hospice may administratively appeal claims generally concerning "the amount due the hospice," and the fact that National Hospice's specific claims may not be among the few listed examples does not compel a finding that its claims are therefore precluded from administrative review. Furthermore, the final sentence of the first paragraph largely parallels the language codified at section 418.311. It is therefore plagued by the same ambiguity as the regulatory language at issue and does not shed further light on the definition of the term "payment rates."

The final sentence of the second paragraph, however, is more difficult. That sentence reads: "The intermediary or PRRB hearings are not appropriate for disputes involving the substance of the regulations or the law, such as the calculation of the payment amounts by [CMS]." CMS does not disagree that National Hospice's claims implicate the "substance of the regulations or the law." CMS contends, however, that the above-quoted language indicates only that the intermediary and the PRRB Board lack authority to decide certain issues, namely the validity of Medicare regulations and statutes. Defs.' Resp. to Pl.'s Sur-Reply at 1-2. But this does not mean that National Hospice's member hospices have no opportunity or obligation to file an administrative appeal on their claims. *Id.* Rather, in such a circumstance, CMS explains that the appropriate administrative procedure is for a hospice to file a claim and then request expedited judicial review. In other words, if the member hospices believe the intermediary or PRRB lacks authority to decide the validity of CMS' final rule eliminating the BNAF, the hospices may request EJR in accordance with the Medicare statute and CMS regulations and obtain judicial review of the 2008 Final Rule after the Board has ruled. The hospices, however,

are still required to present their claims and file an administrative appeal before seeking EJR.  *Id.*

The Court finds that CMS' interpretation is reasonable.  The Medicare regulations recognize a distinction between the Board's authority to decide an issue and the Board's jurisdiction over a claim.  *See Cape Cod Hosp. v. Leavitt*, 565 F. Supp. 2d 137, 141 (D.D.C. 2008) ("Though plaintiffs believe that 'authority to decide the question' and 'jurisdiction to take any legal action in the matter' are one and the same, this is simply not the case.  The former asks whether the PRRB has authority to reach the merits of the plaintiffs' claims, whereas the latter asks whether plaintiffs 'may obtain a hearing' at all.'").

CMS has represented to this Court that National Hospice's member hospices may have their claims heard administratively.  At that time, the Board will determine, either on its own motion or upon request by the claimant, whether it lacks authority to decide the related substantive challenges to CMS' final rule eliminating the BNAF.  CMS avers that only one of two possible outcomes will occur: (a) the Board determines that it is without authority to decide the question, and grants the claimant-hospice expedited judicial review of its substantive challenge to CMS' ruling, thereby allowing the claimant-hospice to commence a civil action within sixty days; or (b) the Board determines that it in fact has the authority to decide the question, and therefore holds a hearing and renders a final decision, after which the claimant-hospice has sixty days to seek judicial review in district court.  National Hospice provides the Court with no reason to doubt CMS' representation.

As explicitly stated in *Illinois Council*, "[t]he fact that the agency might not provide a hearing for that *particular contention*, or may lack the power to provide one, is besides the point because it is the 'action' arising under the Medicare Act that must be channeled through the

agency." *Illinois Council,* 529 U.S. at 23.  The hospices "remain free, however, after following the special review route that the statutes prescribe, to contest in court the lawfulness of any regulation or statute upon which an agency determination depends." *Id.*  Therefore, it is not the case that application of 405(h) will result in the complete denial of judicial review of National Hospice's claims.  Although delayed, judicial review is not denied.[8]  As the Supreme Court has ruled: "Proceeding through the agency in this way provides the agency with the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges.  Nor need it waste time, for the agency can waive many of the procedural steps set forth in § 405(g), and a court can deem them waived in certain circumstances." *Id.* at 24 (internal citations omitted).[9]

---

[8]The Court notes that, in its Motion to Dismiss, CMS argues that any claim by National Hospice that its member hospices may experience financial hardship as a result of the delay in judicial review does not justify federal question jurisdiction in this case. Defs.' Mot. at 20-21. National Hospice, in its opposition, responded only that this Court has federal question jurisdiction because the relevant administrative regulations do not provide administrative review of its claims. *See* Pl.'s Opp'n at 3-8.  National Hospice did not make the alternative argument that judicial review of its claims is precluded as a practical matter because of the potential for financial hardship. *See generally id.*  Accordingly, because National Hospice failed to respond to CMS' argument on this latter point, the Court will treat the argument as conceded. *See Hopkins v. Women's Div., General Bd. of Global Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing *FDIC v. Bender*, 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

[9]In reviewing the question of the Court's subject matter jurisdiction, the Court located a paper-based manual that purported to address administrative appeals by hospices, but which had not been cited to by either party. *See* Min. Order 10/30/08.  The Court requested that the parties provide supplemental briefing indicating whether the manual was applicable to the issues at hand and if so, whether the manual affected the availability of administrative review for National Hospice's claims. *Id.*  As the parties' supplemental briefing demonstrated, the paper-based manual at issue has been superseded by an Internet-only manual that does not contain the same or similar language.  National Hospice argues that the Court should consider this language nonetheless, citing to *Miller v. California Speedway Corp.,* 536 F.3d 1020, 1028 (9th Cir. 2008) and *Norfolk S. Roadway Co. v. Shanklin*, 529 U.S. 344, 356 (2000).  Pl.'s Supp. Resp. at 3.

Accordingly, because National Hospice's claims are subject to administrative review, at the conclusion of which the member hospices may seek receive judicial review of their claims, it is the not case here that application of §§ 1395ii and 405(h) "'would mean no review at all.'" *Illinois Council*, 529 U.S. at 17.  The exception therefore does not apply, and this Court lacks subject matter jurisdiction over National Hospice's claims.

## IV.  CONCLUSION

For the reasons set forth above, the Court shall grant Defendants' [13] Motion to Dismiss pursuant to Rule 12(b)(1), and, because the Court lacks subject matter jurisdiction to consider the merits of Plaintiff's claims, shall deny without prejudice Plaintiff's [2] Motion for Summary Judgment.  An appropriate order accompanies this memorandum opinion.

Date: November 24, 2008

         /s/                       

COLLEEN KOLLAR-KOTELLY
United States District Judge

---

National Hospice's reliance on these cases, however, is misplaced.  As CMS points out, *California Speedway Corp.* involved a current, active manual, not one that, as here, had been superseded.  Defs.' Supp. Resp. at 2 n.1 (citing *California Speedway Corp.*, 536 F.3d at 1026, 1028).  Similarly, *Norfolk S. Roadway Co.* states that deference is not warranted where an agency's interpretation "contradicts the agency's own previous construction *that this Court has adopted as authoritative.*"  529 U.S. at 356 (emphasis added).  No court, however, has addressed the correct interpretation of section 418.311, much less adopted a particular interpretation as authoritative.  The Court therefore declines to give weight to the language in the superseded paper manual.